**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARK EDWARD KEARNEY,** | : | **Civil No. 3:11-CV-1419** |
| | : | |
| **Plaintiff** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **JPC EQUESTRIAN, INC. and** | : | |
| **VARUN SHARMA,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM OPINION

## I.   INTRODUCTION AND STATEMENT OF THE CASE

This litigation stems from a broken and embittered commercial relationship between an independent salesman and an equine-products company.

The plaintiff, Mark Kearney, has sued JPC Equestrian, Inc. ("JPC") and its President, Varun Sharma, alleging that the defendants breached the terms of a sales representation contract by failing to pay Mr. Kearney sales commissions for products he sold on behalf of JPC.  Additionally, Kearney alleges that Sharma tortiously interfered with Kearney's contractual relations by causing another corporate entity that Sharma controlled to engage in sales activity in Mr. Kearney's assigned territories, thereby undercutting the commissions that he would have received from JPC.

After the preliminary disposition of a number of claims, the parties engaged in fact discovery, which has now concluded.  Following that discovery, the parties have filed cross motions for summary judgment, which are now ripe for disposition.  For the reasons that follow, we conclude that Kearney's contract claims are replete with disputed issues of fact, and that the resolution of these disputes must await trial by a jury.  In contrast, we find insufficient evidence to support Kearney's tortious interference claim, and will enter summary judgment in Sharma's favor on this claim alone.

## II.   **FACTUAL BACKGROUND**

The background facts relevant to this dispute begin nearly thirteen years ago, and many do not seem to be seriously disputed.

### A.   **JPC's Business and Operations**

Varun Sharma is a native of India and, since 1992, has operated two businesses in that country.  These businesses manufacture and sell equestrian-related supplies, clothing, and equipment.  Sales from these businesses extend worldwide, and are primarily directed as wholesalers, who then sell the products to retailers.

One of the businesses that Sharma has operated in India is a company called JPC ("JPC-India").  JPC-India is a partnership, in which Sharma owns 90% and his son owns the remaining 10%.  JPC-India primarily sells its products to wholesalers

but sometimes sells to retailers as well.  (Doc. 105, Affidavit of Varun Sharma ("Sharma Aff.") ¶¶ 1-5.)

In early 2002, Sharma came to the United States to establish a new business known as JPC Equestrian, Inc ("JPC").  On February 4, 2002, JPC was incorporated under the laws of Pennsylvania.  JPC is a wholly owned subsidiary of Cotton Naturals India Ltd.  Sharma owns 90% of Cotton Naturals, and his son owns the remaining 10%.  Sharma is the President of JPC, which has its principal place of business in Drums, Pennsylvania.  (Sharma Aff. ¶¶ 6-8.)

JPC sells equestrian-related supplies, clothing, and equipment to retailers in the United States.  It purchases inventory from JPC-India and then sells the product to retail-store customers.  (Sharma Aff. ¶ 9.)  Since it was established in the United States in 2002, JPC has used independent sales representatives to make many, but not all, of its sales.  These sales representatives are assigned territories in which they are responsible for marketing and selling JPC product.  (Sharma Aff. ¶ 21; Deposition of Mark Kearney ("Kearney Dep.") at 37:14-38:1.)  In order to market JPC products, sales representatives purchase product samples from JPC and then show those samples to customers.  (Doc. 104, Def. Statement of Undisputed Facts ("Def. SMF") ¶ 12.)  The sales representatives are all independent contractors, and are paid solely through commissions on sales made to customers.  (Id. ¶ 13.)

Although many of JPC's sales are made through sales representatives, some sales are made through the company's customer service department.  Customers who purchase products through JPC's customer service department are known as "house accounts."  (Id. ¶ 14.)  JPC has used house accounts since 2003.  House accounts are generally internet-based accounts or customers who have asked to deal directly with JPC's customer service department.  (Id. ¶ 15.)

Generally, sales representatives receive 10% sales commissions.  However, because sales to house accounts are made through JPC's customer service department, sales representatives do not receive commissions on these sales.  They also do not receive commissions on close-out sales or other liquidation sales.  (Id. ¶¶ 16-17.)  Sales representatives also receive reduced commissions for bigger, nation-wide customers who are not house accounts, but who consistently buy large quantities of product at a discount.  Commission payments for sales to these larger accounts "generally equals" 5% of the sale price.  (Id. ¶ 18.)

**B.    Kearney's Relationship with JPC and Sharma**

As Sharma was preparing to enter the equine-products market in the United States, he consulted with a lawyer in New Hampshire, who provided him with a form document that was entitled "Sales Representation Agreement," which the lawyer

suggested could be exchanged with the independent sales representatives that Sharma intended to use to market and sell products on behalf of JPC in the United States.

In January 2002, Sharma encountered Mark Kearney at a trade show in King of Prussia, Pennsylvania.  The two men had some familiarity with each other due to their respective involvement in the equine business, and they met during the convention to discuss the possibility of Kearney representing JPC's product line as a commissioned sales representative.  Kearney told Sharma that he would be prepared to begin marketing and selling products for JPC as soon as the company was operational.  As it happens, Kearney would become the first of JPC's independent sales representatives in the United States.

To memorialize this new business relationship, on or about January 28, 2002, Sharma sent Kearney a "Sales Representation Agreement," which purported to outline the parties' relationship.[1]  In preparing the Agreement, Sharma took the form that he

---

[1] Although the defendants now disclaim the term "Agreement" for this document, and use the generic term "Document" to define it in their briefs, we will refer to the document as the "Agreement" in this memorandum.  In doing so, the Court is not signaling that the document is necessarily a binding contract, or that the terms it contains were necessarily terms to which the parties' ultimately agreed; as noted, we find that disputed issues of fact exist as to whether the parties entered into the Agreement, what the terms of their contractual relationship were, if any, and whether JPC breached the terms of such contract.  The term "Agreement" is, however, consistent with the title of the document that Sharma provided to Kearney for his signature, and is more descriptive of what the document appears to be.

had been provided by the New Hampshire attorney, and inserted Mark Kearney's name and information.

Pursuant to the terms of the Agreement, Kearney agreed to be engaged as a sales representative for JPC as an independent contractor.  The Agreement provided that Kearney would:  (1) implement a marketing program to sell JPC's products within a geographic region that consisted of 15 states clustered mostly in the Midwest and the South; (2) meet "reasonable gross sales requirements" that would be assigned but which were not specified in the document itself; (3) introduce product lines with retailers within the assigned geographic territory; and (4) exercise responsibility for "all sales resulting directly or indirectly from the Sales Representative's introduction to, or other initiation of business relationships with the retailers".  (Doc. 112-1, Ex.)

The Agreement also provided, apparently with no exceptions, that Kearney would be paid a 10% commission on the total net payable invoices on sales made by the company and which resulted "from the Sales Representative's Introductions or other interventions." (Id.) The Agreement also provided that Kearney would bear his own expenses, with certain exceptions, and prohibited him from working for

competitors while serving as JPC's representative.  The Agreement also spelled out the procedures and timing by which either party could terminate the Agreement.[2]

This "Sales Representation Agreement" itself bears the indicia and customary hallmarks of a commercial contract, and Kearney claims that he believed that the Agreement governed his relationship with JPC.  Nevertheless, whether the document in fact formed a contract between the parties, and if so whether it was modified, waived, or ultimately breached by JPC's failure to pay Kearney full 10% commissions on all sales he generated for the company, are questions central to this litigation.

The defendants insist that the "Sales Representation Agreement" that Sharma prepared, signed and provided to Kearney does not amount to a contract.  To the contrary, the defendants emphasize that the "Agreement" was never negotiated by the parties.  They also assert that Kearney failed to sign and return the document (something Kearney now disputes), and they highlight numerous instances where the parties did not faithfully follow each and every provision of the agreement over the

---

[2] The Agreement correlates essentially to the terms that Kearney has attested he wanted as part of any deal with JPC.  In his affidavit, Kearney states that he told Sharma that he expected a 10% commission on all sales made within his sales territory, which would be protected; no house accounts; and the provision of free samples to use in selling JPC products.  (Doc. 112-2, Affidavit of Mark Kearney ¶ 5.)

course of their eight years of commercial dealings with one another (something Kearney acknowledges, but argues actually supports his claims that the defendants repeatedly breached the parties' agreement).

Despite entirely disclaiming the written document that Sharma tendered to Kearney for his signature, and despite arguing that the parties so disregarded the terms of this document as to render it a nullity, when Sharma notified Kearney that JPC was terminating him as a sales representative in August 2010, his correspondence to Kearney suggested that the termination was based directly on the terms of the "Agreement," since it referred to the precise notice periods that were established by the Agreement. Thus, Sharma sent Kearney two separate emails, the first invoking a 90-day termination period, which corresponds to the normal notice period called for under the Agreement. In that email, Sharma indicates that the email should be construed as "termination of our independent representative contract," and provides that the 90-day notice period would be effective from August 10, 2010. (Doc. 112-2, Kearney Aff., Ex., Email from Varun Sharma to Mark Kearney dated August 11, 2010.)

The very next day, Sharma sent Kearney a second email, this time to inform Kearney that because he had been representing the Wellington Collection line, a competitor company, JPC would not give him a 90-day notice period, but "[a]s per

the contract, only a 15 days notice period need be given if you are representing a competing line." (Doc. 112-2, Kearney Aff., Ex., Email from Varun Sharma to Mark Kearney dated Aug. 12, 2010.) Kearney submits that Sharma was clearly basing his termination notice on the provisions contained within the Sales Representation Agreement, and argues that this supports his claim that the defendants considered the Agreement to be binding and enforceable. For their part, the defendants suggest that the 90-day and 15-day termination provisions were not necessarily derived from the terms of the Agreement that Sharma had furnished to Kearney in 2002, but they do not offer any alternative explanation for Sharma's use of these notice periods, or the fact that he refers to "the contract". Kearney argues that this argument is little more than legal sophistry.

Kearney claims that although he was typically paid the 10% commission called for under the Agreement, at numerous times JPC failed to pay Kearney a 10% percent commission on certain accounts, and instead paid him only 5% for these accounts – something that Sharma has attested was the standard practice for JPC. Later, Kearney claims that JPC converted some large accounts to "house accounts" and thus paid him no commissions at all on sales made to these accounts even if they were within Kearney's sales territory, and even if Kearney was the party responsible for initiating the business relationship with the customer. Kearney also alleges that JPC sold

directly to a number of Kearney's customers in order to avoid paying Kearney a commission as required under the Agreement.  Finally, Kearney alleges that Sharma tortiously interfered with Kearney's contract with JPC by selling products on behalf of JPC-India, in direct competition with JPC, and, therefore, denied Kearney the benefit of his contract with JPC by interfering with his sales efforts, and impairing his ability to earn commissions on the sales he generated.

JPC and Sharma take a decidedly different, and far narrower, view of the parties' relationship.  Although they never explain or define the precise nature of the commercial relationship that JPC and Kearney had for eight years, or whether that relationship was governed by any written or oral contractual agreement, they are adamant that the "Sales Representation Agreement" first tendered from Varun Sharma to Mark Kearney in January 2002 did not form a contract.  In support of this assertion, the defendants contend that Kearney never signed the Agreement, despite being asked to do so by Sharma.  In the absence of a copy of the "Agreement" bearing Kearney's signature, the defendants insist the document never matured into an enforceable contract.

The defendants also note that the "Agreement" was not negotiated by the parties, and more importantly, the defendants maintain that the parties did not act consistently with numerous terms of the Agreement.  Despite undisputed evidence

showing that the parties adhered to many of the terms of the Agreement, the defendants insist that the parties paid so little regard to certain other terms that it compels a finding that the parties never manifested their assent to the Agreement.

Furthermore, the defendants argue that even if there were factual disputes regarding whether the parties entered in to the Agreement, they submit that summary judgment is nevertheless warranted because Kearney has waived his right to enforce the contract's terms.  Here the defendants are saying that because Kearney continued working even as he was being paid less than full commissions on his sales, his passivity should be construed as a waiver of his right now to enforce the terms of the parties' arrangement.  Thus, the defendants argue that "Kearney cannot, all of a sudden, now enforce the Document."  (Doc. 106, at 19.)

Finally, the defendants argue that they are entitled to summary judgment on Kearney's tortious interference claim.  The defendants assert that Kearney has no evidence to show that Sharma caused JPC to breach any contract that it had with Kearney, and there is no evidence showing that Sharma as a third party interfered with a contract that Kearney may have had with JPC.  Kearney, in contrast, argues that his claim is straightforward:  JPC India sells bulk goods of the same type as those sold by JPC in smaller quantities, and in numerous instances Sharma, acting as managing director of JPC India, interfered with Kearney's contract with JPC by

11

selling goods in direct competition with JPC, and, therefore, denying Kearney the benefit of his own contract with JPC, particularly with respect to one specific customer that Kearney had developed for JPC, Schneider's Saddlery.

Thus, despite agreeing on many of the facts in this case, the parties take sharply different views of the claims and the factual record, and those sharply divergent views are reflected in competing evidence in the record that makes summary judgment in favor of either party on Kearney's breach-of-contract claim inappropriate at this time.

Although it is difficult to embrace the defendants' assertion that the parties operated for eight years in a commercial relationship without any contractual arrangement, and although many of the defendants' interpretive arguments seem extraordinarily narrow, we nonetheless find that there do remain sufficient questions as to whether and when Kearney and JPC entered into an enforceable contract, and if so what the terms of that contract were, and whether those terms were breached.

In contrast, we find Kearney's tortious interference claim against Varun Sharma lacks sufficient evidentiary support, and is undermined by Sharma's sworn explanation regarding the nature of JPC-India's sales to customers that Kearney was endeavoring to develop for JPC.

Accordingly, for the reasons that follow, the parties' cross-motions for summary judgment will be denied with respect to Kearney's breach-of-contract

claims, and granted in favor of Varun Sharma with respect only to Kearney's tortious-interference claim.

## III.   STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides as follows:

> A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion.

Fed. R. Civ. P. 56(a).  For purposes of Rule 56, a fact is material if proof of its existence of nonexistence might affect the outcome of the suit under the applicable substantive law.  Haybarger v. Laurence Cnty. Adult Prob. & Parole, 667 F.3d 408, 412 (3d Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  For an issue to be genuine, "all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  Id. (quoting Anderson, 477 U.S. at 248-49).

Accordingly, in support of a motion for summary judgment, the moving party must show that if the evidence of record were reduced to admissible evidence in court, it would be insufficient to allow the non-moving party to carry its burden of

proof.  See Celotex v. Catrett, 477 U.S. 317, 323 (1986).  Provided the moving party has satisfied this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  Instead, if the moving party has carried its burden, the non-moving party must then respond by identifying specific facts, supported by evidence, which show a genuine issue for trial, and may not rely upon the allegations or denials of its pleadings.  See Martin v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007); see also Fed. R. Civ. P. 56(c).

In adjudicating the motion, the court must view the evidence presented in the light most favorable to the opposing party, Anderson, 477 U.S. at 255, and draw all reasonable inferences in the light most favorable to the non-moving party, Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). Where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true.  Id.  Additionally, the court is not to decide whether the evidence unquestionably favors one side or the other, or to make credibility determinations, but instead must decide whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.  Id. at 252; see also Big Apple BMW, 974 F.2d at 1363.  In reaching this determination, the Third Circuit has instructed that:

14

> To raise a genuine issue of material fact . . . the opponent need not match, item for item, each piece of evidence proffered by the movant. In practical terms, if the opponent has exceeded the "mere scintilla" threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. It thus remains the province of the factfinder to ascertain the believability and weight of the evidence.

Id. In contrast, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotation marks omitted); NAACP v. North Hudson Reg'l Fire & Rescue, 665 F.3d 464, 476 (3d Cir. 2011).

When a court is presented with cross-motions for summary judgment, "the court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard." See Schlegel v. Life Ins. Co. of N. America, 269 F. Supp. 2d 612, 615 n.1 (E.D. Pa. 2003) (quoting 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2720 (1998)); see also Marciniak v. Prudential Financial Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006).

## IV.   **DISCUSSION**

### A.   **Disputed Issues of Fact Remain with Respect to Kearney's Breach of Contract Claim**

"Where the facts are in dispute, the question of whether a contract was formed is for the jury to decide."  Ingrassia Construction Co. v. Walsh, 486 A.2d 478, 482 (Pa. Super. Ct. 1984) (quoting O'Neill v. ARA Services, Inc., 457 F. Supp. 182, 185 (E.D. Pa. 1978)).

Mindful of this overarching principle of contract law and the proper respective roles of the court and the jury, we first consider the defendants' assertion that the Agreement never formed a contract between Kearney and JPC.  The Agreement provides that it was to be interpreted in accordance with Pennsylvania law, and the parties have at all times indicated that they mutually believe that Pennsylvania law governs the claims in this case.  The defendants argue that Kearney's failure to sign the document caused it to be entirely unenforceable, and they argue that the parties' subsequent conduct compels a finding that neither Kearney nor JPC considered themselves to be bound by the Agreement's terms.

As a threshold matter, as the party prosecuting a claim for breach of contract, Kearney bears the burden of proving the following:  (1) the existence of a contract; (2) a breach of duty imposed by the contract; and (3) resultant damages.  Pennsy

Supply, Inc. v. Am. Ash. Recycling Corp., 895 A.2d 595, 600 (Pa. Super. Ct. 2006).

Pennsylvania law holds that a contract is enforceable "when the parties to it 1) reach

a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their

bargain with sufficient clarity." Helpin v. Trustees of the Univ. of Pa., 969 A.2d 601,

610 (Pa. Super. Ct. 2009) (quoting Weavertown Transport Leasing, Inc. v. Moran,

834 A.2d 1169, 1172 (Pa. Super. Ct. 2003)).

"The law of this Commonwealth makes clear that a contract is created where

there is mutual assent to the terms of a contract by the parties with the capacity to

contract." Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd., 739

A.2d 133, 136 (Pa. 1999).  Notably, "[a] true and actual meeting of the minds is not

necessary to form a contract.  In ascertaining the intent of the parties to a contract, it

is their outward and objective manifestations of assent, as opposed to their

undisclosed and subjective intentions, that matter." Ingrassia Constr. Co., 486 A.2d

at 482-83 (citations omitted).[3]  Furthermore, "[i]f the parties agree upon essential

---

[3] As one treatise explains:

> According to the objective theory of contract formation,
> what is essential is not assent, but rather what the person to
> whom a manifestation is made is justified as regarding as
> assent.  Thus, if an offeree, in ignorance of the terms of an
> offer, so acts or expresses itself as to justify the other party
> in inferring assent, and this action or expression was of
> such a character that a reasonable person in the position of

terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later date." Hartman v. Baker, 766 A.2d 347, 351 (Pa. Super. Ct. 2000) (citation omitted). Moreover, "[a]s a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." Id. (quoting Shovel Transfer and Storage, 739 A.2d at 136). Additionally, "an offer may be accepted by conduct and what the parties d[o] pursuant to th[e] offer is germane to show whether the offer is accepted." Id. (quoting Schreiber v. Olan Mills, 627 A.2d 806, 808 (Pa. Super. Ct. 1993)).

Under Pennsylvania law, courts determining whether the parties objectively manifested their intention to be bound will consider the entire document asserted to represent the parties' contractual agreement, and assess the relevant circumstances that surround the document's creation, including the parties' conduct. See Channel Home Centers v. Grossman, 795 F.2d 291 (3d Cir. 1986) (vacating and reversing the district court's determination that there was no enforceable agreement based upon a

_____

the offeree should have known it was calculated to lead the offeror to believe that the offer had been accepted, a contract will be formed in spite of the offeree's ignorance of the terms of the offer.

1 Richard A. Lord, Williston on Contracts § 4:19 (4th ed. 2008) (quoted in Morales v. Sun Constructors, Inc., 541 F.3d 218, 222 (3d Cir. 2008)).

property owner's promises to a prospective tenant).   Guided by these bedrock principles of Pennsylvania contract law, we turn to the defendants' contention that the Agreement that Sharma filled out, signed, and provided to Kearney did not actually constitute a binding contract.

As an initial matter, the defendants place undue weight on the fact that neither party has produced a copy of the Agreement that bears Mark Kearney's signature.  It is undisputed that Sharma prepared the document, that he signed the document, and that he sent the document to Kearney with a request that he sign it.   Although Kearney has submitted an affidavit in which he attests his belief that he did sign the document, it is undisputed that no copy of the Agreement has been produced with the signatures of all parties.  Relying on standard language contained in the Agreement that provides that it "may be executed in two or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument," (Doc. 1-1.), and a single unpublished decision narrowly construing this language as creating an ironclad requirement that such an agreement be signed by both parties to be enforceable, the defendants argue that the absence of Mark Kearney's signature renders the entire Agreement unenforceable as a matter of law. We disagree.

A document signed by only one party may be enforceable "as long as both parties accept and act under its terms." <u>Sullivan v. Allegheny Ford Truck Sales, Inc.</u>, 423 A.2d 1292, 1295 (Pa. Super. Ct. 1980). Although the defendants acknowledge this principle of contract law, they nonetheless argue that in this case the absence of a fully signed agreement compels a finding that the Agreement never matured into a binding contract. The defendants' support this assertion by relying exclusively on <u>Buzzmarketing, LLC v. The Upper Deck Company, LLC</u>, No. Civ. A. 03-4392, 2004 WL 966241 (E.D. Pa. May 6, 2004), an unpublished decision in which the court considered the question of whether parties who orally agreed to the terms of an unsigned written contract were bound by the terms of the writing.

In <u>Buzzmarketing</u>, the court noted that the Pennsylvania Supreme Court has held that the mere fact that a proposed contract contained signature lines is not conclusive evidence that the parties intended to require the contract to be executed only in writing, but also held that if the contract had contained language "stating the parties' intent to execute the agreement in writing, the oral agreement would indeed have been invalid." <u>Id.</u> (citing <u>Shovel Transfer & Storage, Inc. v. Pennsylvania Liquor Control Bd.</u>, 739 A.3d 133, 138 (Pa. 1999). In <u>Shovel Transfer</u> the court found the absence of such intentional language in the written agreement would be construed against the drafting party, and held that the inclusion of signature lines

alone was insufficient proof of the parties' intent that the agreement needed to be executed in writing to be binding.  Accordingly, the <u>Shovel Transfer</u> court found that the parties' oral agreement to the terms of a written, but unsigned, contract were enforceable.  <u>Id.</u>

In contrast, the <u>Buzzmarketing</u> court cited to a decision of the Pennsylvania Commonwealth Court which held that a proposed contractual clause that provided that the contract in question would "not be fully executed and binding on the Parties unless and until all signatures are affixed hereto" manifested the parties' intent to execute the contract only in writing.  <u>Id.</u> (citing <u>Commonwealth v. On-Point Technology Sys., Inc.</u>, 821 A.2d 641, 648, 649 n.13 (Pa. Commonw. Ct. 2003).  The inclusion of such mandatory language satisfied the holding of <u>Shovel Transfer</u> that a contract will not be enforceable if both parties expressly agreed that full execution of the agreement by both parties was a condition to enforcement.

Relying on the foregoing cases, the <u>Buzzmarketing</u> court turned to the language of the unsigned written agreement at issue in that case.  That language provided only that "[t]his Agreement *may* be executed in counterparts and facsimile signatures shall suffice as originals."  <u>Buzzmarketing, LLC</u>, 2004 WL 966241, at *3 (emphasis added).  Although this boilerplate language contained none of the mandatory language at issue in <u>On-Point Technology</u> that the Commonwealth Court found

21

manifested the parties' intent to enter into only a fully-executed written agreement, the court nevertheless concluded that the clause "signatures shall suffice" to execute the agreement "clearly indicate[d] the parties' intent to execute the agreement only by signing it." Id.

Upon consideration, we do not find the Buzzmarketing court's analysis of this issue to be persuasive, and we do not agree that the holding in On-Point Technology adequately supports the court's conclusion. Whereas the contractual language at issue in On-Point Technology plainly stated that the contract would "not be fully executed and binding on the Parties unless and until all signatures are affixed hereto," the language in the document in Buzzmarketing merely allowed for the parties to execute the document in counterpart and by facsimile; it did not contain anything comparable to the mandatory language used by the parties in On-Point Technology. For that reason, we do not agree with the court's assessment that "it is difficult to conceive of any reasonable reading of this term under which the agreement could be executed without the signatures of both parties." Id.

Since the language used in the Agreement did not expressly make clear that the agreement could only become effective upon the signature of both parties, and because the language regarding counterparts and facsimile signatures are familiar and typical clauses used in commercial contracts generally, we do not agree that use of

this customary language causes all agreements bearing this language to become unenforceable in the absence of signatures.

Our interpretation of the language at issue, and the teaching of <u>Shovel Transfer</u>, is bolstered by the fact that Pennsylvania has long recognized that a document signed by only one party may be enforceable "as long as both parties accept and act under its terms." <u>Sullivan v. Allegheny Ford Truck Sales, Inc.</u>, 423 A.2d 1292, 1295 (Pa. Super. Ct. 1980). The decisions in <u>Shovel Transfer</u> and <u>On-Point Technology</u> do not fundamentally change that principle; instead those cases simply recognize that parties can agree with one another that any written agreement they are negotiating will not become binding unless and until both parties sign the document. Accordingly, we do not find that the typical, even boilerplate, language used in the Agreement regarding the manner of signature rendered the contract entirely unenforceable in the absence of both parties' signatures.

## B. Neither Party is Entitled to Summary Judgment Based Upon Pre-Contracting or Post-Contracting Conduct

Next, the defendants argue that the Agreement should be declared unenforceable because "[t]he relevant circumstances surrounding the Document's creation and the parties' behavior afterward also show that the parties never intended to be bound by the Document." (Doc. 106, at 13.) In particular, the defendants argue

that Kearney and Sharma did not actively negotiate the terms of the Agreement, and that after the Agreement was exchanged the parties acted in a manner that was inconsistent with some of the Agreement's terms.   In making these arguments, however, the defendants are really arguing about how the facts should be interpreted, and they do not persuade us that those facts compel the entry of summary judgment in their favor on the question of whether the parties entered into a valid and binding contract in 2002.

The defendants note that when Sharma sent the Agreement to Kearney in January 2002, it was not accompanied by a cover letter, and Kearney did not discuss the Agreement with Sharma or anyone else at JPC prior to or after receiving it. Additionally, the defendants maintain that Kearney did not sign the agreement, or at least has been unable to produce a signed copy.

In addition to arguing that the parties' pre-contracting conduct suggests that the parties were not in mutual agreement, the defendants set forth numerous instances where the parties behaved contrary to, or inconsistently with, the terms of the Agreement.   Thus, for example, the defendants note that although the Agreement provided that Kearney would "meet reasonable gross sales requirements that are assigned . . . by the Company," (Agreement ¶ 1(b)), it is undisputed that JPC never established or imposed sales requirements on Kearney.   (Kearney Dep. at 28:15-24,

24

p. 29; Sharma Affid. ¶ 29(a).)  The defendants also note that paragraph 1(d) of the Agreement purports to require Kearney, as the sales representative, to collect payments from customers, but this was never done.  (Kearney Dep. at 29:2-8; Sharma Affid. ¶ 29(b).)  Likewise, the Agreement prohibits a sales representative from selling products that compete with JPC's products, but there is evidence to show that Kearney sold products on behalf of several equine-supply companies during the time he was selling on behalf of JPC, and continued to do so even after JPC asked him to stop.  (Kearney Dep. at 29:9-24 - 31:1-13; Sharma Affid. ¶ 29(c).)

The Agreement further provided that the sales representative would receive a 10% commission on sales "directly resulting from the Sales Representative's introductions or other interventions."  (Agreement ¶ 4.)  It is undisputed that on multiple occasions, Kearney was not paid a 10% commission on close-out sales, house accounts, or sales made to larger, national account customers, and these practices existed over the course of the parties' eight-year relationship.  Notably, however, Kearney sees this undisputed fact as supporting his claim of breach, since he claims to have complained to Sharma and JPC repeatedly about being under paid on his commissions, but when his complaints did not succeed, he elected to continue working even though he believed that he was entitled to full commissions.  For their part, the defendants argue that JPC's routine practice of paying less than 10% commissions

depending upon the particular customer and circumstances shows that the parties did not intend to be bound by the single 10% commission provided for in the Agreement. We believe that the parties' divergent interpretation of these facts highlight a material factual dispute, and does not compel the entry of judgment for either party as a matter of law.

The defendants submit numerous other instances where they claim the parties disregarded the Agreement's terms, or did not faithfully comply with them, including:

- Paragraph 5 of the Agreement provides that JPC "will provide product samples to the Sales Representative at no cost," but since the parties began working together JPC required Kearney to purchase his own samples, and Kearney did not claim that this practice violated the Agreement. (Kearney Dep. at 32:3-33:23; Sharma Affid. ¶ 29(f));

- Paragraph 8 of the Agreement is a non-competition clause, which purports to restrict Kearney from selling products on behalf of JPC's competitors for one year after ending his relationship with JPC, yet Kearney began selling products on behalf of another equine-products company days after he stopped selling for JPC.[4] (Kearney Dep. at 34:2 - 35:22; Sharma Affid. ¶ 29(g));

- Paragraph 18 of the Agreement provides that "any dispute arising under this Agreement . . . will be submitted to arbitration in accordance with the rules of the American Arbitration Association." However, Kearney did

---

[4] Ironically, JPC actually threatened to enforce this paragraph against Kearney after he filed this lawsuit, but never initiated such a claim. Although initially invoking this paragraph, and thus suggesting that it considered the provision to be enforceable, JPC now contends that the parties' failure to faithfully abide by this paragraph establishes that the Agreement was not an enforceable contract. (Doc. 106, at 16.)

not submit this matter to arbitration prior to bringing suit, and JPC did not seek to enforce this paragraph.  (Kearney Dep. at 36:8-20; Sharma Affid. ¶ 29(h));

•   Paragraph 1(a) of the Agreement identifies Exhibit A as Kearney's sales territory, but is not entirely accurate or consistent with the territories that Kearney serviced during the course of his relationship with JPC.

The defendants aggregate the foregoing instances where the parties did not strictly comply with the Agreement's provisions and terms, and argue that the conduct of the parties suggests a complete absence of "outward and objective manifestations of assent" to the terms of the Agreement.  (Doc. 106, at 17) (citing Ingrassia Constr. Co., Inc., 486 A.2d at 483.)  Kearney agrees that the parties did not always follow the Agreement's terms, but he argues that this does not compel a finding that the parties entirely disregarded it.  He attests that he was disappointed when he was paid less than 10% commissions, and he claims to have been frustrated by having to pay for his own samples from JPC, and he claims to have repeatedly complained to Sharma about these matters, without success.  But when his complaints to the company did not resolve the matter, he claims that he elected to continue working on JPC's behalf because it was in his overall interest to do so.  Thus, Kearney sees these examples not as evidence that the parties' so disregarded the terms of the Agreement as to render it entirely unenforceable, but rather as evidence of an ongoing course of JPC breaching the contract when it chose to.

On the record before the Court, we find that summary judgment in favor of either party is inappropriate on the question of whether the parties entered into a binding Agreement and, if so, what the scope of its terms were, and we do not find that these questions may be answered as a matter of law by this Court based purely upon examples of the parties' conduct over a lengthy commercial relationship. The defendants' collection of instances where the parties diverged from the precise terms of the Agreement are not sufficient to show that there was a complete absence of "outward and objective manifestations of assent," since it is also undisputed that Sharma prepared and signed the Agreement, Kearney began selling on behalf of JPC immediately after being provided the Agreement that Sharma himself prepared and executed, and in many respects the parties seem to have followed fundamentally material aspects of the Agreement. Furthermore, there is evidence to show that Sharma required all sales representatives to have signed contracts, and that he maintained a file with these contracts at JPC's headquarters in Drums, Pennsylvania, thus suggesting that is was common practice for JPC to enter into agreements with its independent sales force.

Furthermore, there are specific examples in the record to show that Sharma and JPC acted in a manner that indicated that they construed the Agreement as being enforceable between the parties. Thus, in terminating Kearney's relationship with

JPC, Sharma referred to 90-day and 15-day notice provisions that correspond precisely with the notice provisions set forth in the Agreement, and even after this litigation commenced, JPC's counsel threatened to enforce the Agreement's non-compete clause set forth in Paragraph 8. Although these instances may not compel summary judgment in Kearney's favor at this time, they certainly provide material support for his claim that the parties entered into a binding contract, and that JPC breached that agreement.

C.      **The Defendants are Not Entitled to Summary Judgment on Their Affirmative Defense that Kearney Waived His Rights Under the Agreement**

The defendants argue that even if the Court finds that disputed issues of fact preclude summary judgment as to whether the parties entered into an enforceable contract, the Court should nevertheless grant summary judgment because Kearney waived his right to enforce the Agreement as a matter of law. Here, too, we disagree.

"A waiver is the intentional relinquishment of a known right." Consol. Rail Corp. v. Delaware & H. R. Co., 569 F. Supp. 26, 29 (E.D. Pa. 1983); Brown v. Pittsburgh, 186 A.2d 399, 401 (Pa. 1962). Under Pennsylvania law, parties may waive contract provisions. Trumpp v. Trumpp, 505 A.2d 601, 603 (Pa. Super. Ct. 1985). "To constitute a waiver of a legal right, there must be a clear, unequivocal and decisive act of the party with knowledge of such right and an evident purpose to surrender it." Brown, 186 A.2d at 401. Waivers may be express or implied. Id. In this case, the

defendants argue that Kearney impliedly waived his right to enforce the terms of the Agreement governing payment of commissions, and the provision of samples.

An implied waiver exists where: (1) there is an "unexpressed intention to waive, which may be clearly inferred from the circumstances"; or (2) when there is no such actual intention to waive, but where a party's conduct "misleads [the other contracting part] into a reasonable belief" that a contract provision no longer matters. Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1223 (Pa. Super. Ct. 1989) (applying New York law). However, "[i]t is well settled under Pennsylvania law that the doctrine of implied waiver 'applies only to situations involving circumstances equivalent to an estoppel, and the person claiming the waiver to prevail must show *that he was misled and prejudiced thereby*.'" Consol. Rail Corp. v. Delaware & H. R. Co., 569 F. Supp. 26, 29-30 (E.D. Pa. 1983) (emphasis in original). "In other words, applying the same standards as used in claims of estoppel, the moving party must show that it was prejudiced because the promise caused it to change its position." 2101 Allegheny Assocs. by Rappaport v. Cox Home Video, Inc., Civ. A. No. 91-2743, 1991 WL 225008, at *9 (E.D. Pa. Oct. 29, 1991). The party asserting waiver as a defense has the burden of proving that the counterparty impliedly waived its right to enforce a contractual provision. Id.; United States ex rel. E.C. Ernst, Inc. v. Curtis T. Bedwell & Sons, Inc., 506 F. Supp. 1324, 1329 (E.D. Pa. 1981).

The defendants argue that Kearney's failure to seek legal enforcement of his rights under the Agreement over eight years should now be construed as a matter of law to constitute waiver of those claims. The defendants have not carried their burden in this regard, in large part because other than to cite to cases in which waiver has been found, they have not demonstrated that in their case they were actually misled by Kearney's conduct, or that they were actually prejudiced by Kearney's decision not to enforce his alleged rights under the Agreement. Moreover, we again note the instances in which the defendants would seem to have acted in a manner suggesting that they continued to believe that certain terms of the Agreement were or may be enforceable against Kearney, such as the notice requirements for termination, and the threat to sue Kearney for violating the terms of the Agreement's non-compete clause. Since the defendants have not demonstrated that they were somehow misled by Kearney, or that they are now unreasonably prejudiced by his claims of breach, we cannot agree that a jury would be compelled to find in their favor on this affirmative defense, or their contention that Kearney's "behavior (or lack thereof) towards the Document during the parties' relationship minimized its importance to nothingness." (Doc. 106, at 19.)[5]

---

[5] Moreover, the defendants offer especially thin legal support for their argument regarding waiver. The defendants essentially rely on a single bankruptcy court decision in which a party's failure to enforce a warranty to repair

Although we do not find that the defendants are entirely foreclosed from pursuing their affirmative defense of waiver at trial, they are not entitled to summary judgment on the basis of the defense.

In summary, we find that there remain disputed issues of material fact with respect to whether the parties had entered into an enforceable sales representation contract; about whether the defendants breached that contract; about which terms of that contract, if any, may have been breached; and about whether Kearney may have waived his right to enforce any aspect of that Agreement by waiting to bring suit until 2010.

## D.    Sharma is Entitled to Summary Judgment on Kearney's Tortious Interference Claim

Kearney claims that Varun Sharma tortiously interfered with his rights under the Agreement, and undercut his ability to earn commissions under the Agreement, by funneling sales in Kearney's territories from JPC to JPC-India.  Thus, Kearney alleges that Sharma sold products on behalf of JPC-India, and these products were precisely

---

a medical device lulled the defendant into believing that its services were acceptable.  In re Imaging Services, 143 B.R. 355, 359 (Bankr. W.D. Pa. 1992). The defendants in this case do not persuasively analogize the performance guarantee at issue in In re Imaging Services to the sales representation agreement that is the subject of this case, or explain how Kearney's alleged decision to continue working despite the defendants' alleged breaches of the parties' agreement is analogous to the failure to exercise rights under a service warranty.

the same type and nature sold by JPC in smaller quantities. In one specific instance, Kearney claims that he helped to arrange a sale of products to a particular retailer, Schneider's Saddlery, and understood that the sale would be from JPC to Saddler's, and, therefore, would earn him a commission. Kearney claims that Sharma diverted this sale to JPC-India, which fulfilled the sale, and thereby denied Kearney a commission that he claims he was owed under the Agreement. The evidence, however, does not support this claim.

Pennsylvania law has adopted the Restatement (Second) of Torts § 766, governing the tort of malicious interference with contract. Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175 (Pa. 1979); see also Daniel Adams Assocs., Inc. v. Rimbach Pub., Inc., 519 A.2d 997, 1000 (Pa. Super. Ct. 1987). Section 766 explains the tort as follows:

> One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

Restatement (Second) of Torts § 766.

To maintain a claim for tortious interference, Kearney bears the burden of demonstrating: (1) the existence of a contractual, or prospective contractual

relationship between the plaintiff and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relationship, or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) actual legal damages resulting from the defendant's conduct. <u>CGB Occupational Therapy, Inc. v. RHA Health Servs. Inc.</u>, 357 F.3d 375, 384 (3d Cir. 2004). Kearney has not come forward with sufficient evidence to allow this claim to move beyond summary judgment.

Kearney claims that Sharma, acting on behalf of JPC-India, interfered with the Agreement between Kearney and JPC by acting on behalf of JPC-India to divert sales from JPC to JPC-India, thereby depriving Kearney of sales commissions. Yet, Kearney never points to evidence showing that Sharma, acting on behalf of another corporate entity that he also controlled, intentionally interfered with an actual contractual relationship that Kearney and JPC enjoyed. Even assuming that the Agreement constituted an enforceable contract, Kearney does not explain, or point to evidence showing that Sharma interfered with that contract by negotiating sales on behalf of JPC-India that may arguably have impacted Kearney's ability to earn commissions. He simply asserts that Sharma undermined his ability to earn commissions by selling products through JPC-India rather than through JPC.

Even assuming that this alone could support a tortious interference claim, however, Sharma has submitted evidence showing that although he did arrange sales from JPC-India to Schneider's Saddlery, it was precisely because the owner of Schneider's approached him about purchasing custom-made horse clothing for his company, with custom-made labels, and that JPC-India fulfilled this order because JPC, as a wholesaler, does not manufacture equestrian products, whereas JPC-India does. (Sharma Aff. ¶ 38.)

Although Kearney may also have had a relationship with Schneider's, and although he may have endeavored to sell products to that party, he has not countered Sharma's sworn attestation with anything other than his own argument; he has not identified evidence that would show that Sharma's sales on behalf of JPC-India impaired the ability of JPC to market and sell the products that it was in the business of selling, and he has not shown how Sharma's sales on behalf of JPC-India otherwise caused JPC to breach a contractual duty to Kearney. We thus find an absence of evidence to support Kearney's claim that Sharma tortiously interfered with his alleged contractual right to earn commissions from JPC, and the absence of sufficient evidence to support this claim compels the entry of summary judgment in Sharma's favor.

## V.     **CONCLUSION**

Accordingly, for the foregoing reasons, the plaintiff's motion for partial summary judgment will be denied, and the defendants' motion for summary judgment will be granted with respect to Kearney's tortious interference claim only, and will be denied in all other respects.

An order consistent with this memorandum shall issue separately.


**/s/ Martin C. Carlson**
Martin C. Carlson
United States Magistrate Judge